Timothy B. Strauch
Ward E. "Mick" Taleff
Amanda Beckers Sowden
RESOLUTE LAW FIRM PLLC
257 West Front Street, Suite A
Missoula, Montana 59802
(406) 532-2600
tim@mtresolutelaw.com
mick@mtresolutelaw.com
amanda@mtresolutelaw.com

*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

| | |
|---|---|
| TYLER and ALYSSA HOBBS,<br><br>Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>Defendant. | Case No. _____<br><br><br>**COMPLAINT and JURY DEMAND** |

Tyler and Alyssa Hobbs (the "Hobbses"), demanding trial by jury, for their Complaint against Wells Fargo Bank, N.A. ("Wells"), allege as follows:

## PARTIES

1. The Hobbses are married citizens of the State of Montana and residents of Missoula County, Montana.

2. Wells is a national bank incorporated in Washington, D.C. Wells has a principal place of business in Sioux Falls, South Dakota. Wells is and was authorized to transact and, at all times relevant to the claims alleged in this Complaint, transacted business in Montana. On information and belief, Wells operates 22 branches in 13 different cities and towns in Montana, including at least three branches in Missoula.

## VENUE AND JURISDICTION

3. Venue in this action is proper under 28 U.S.C. § 1391.

4. This Court has diversity jurisdiction over this matter under 28 U.S.C. § 1332, as the matter in controversy exceeds the sum or value of $75,000 and is between citizens of different states.

## FACTS SUPPORTING CLAIMS

5. Wells holds itself out to Montana consumers in its most recent (as of the date of this Complaint) quarterly report on the website for the Missoula branches as follows:

> Wells Fargo & Company (NYSE: WFC) is a leading financial services company that has approximately $1.96 trillion in assets. We provide a diversified set of banking, investment and mortgage products and services, as well as consumer and commercial finance, through our four reportable operating segments: Consumer Banking and Lending, Commercial Banking, Corporate and Investment Banking, and Wealth & Investment Management. Wells Fargo ranked No. 47 on Fortune's 2023 rankings of America's largest corporations. In the communities we serve, the company focuses its social impact on building a sustainable, inclusive future for all by

supporting housing affordability, small business growth, financial health, and a low-carbon economy.

6. In 2022, the Hobbses were building a new primary residence at 10851 Bruin Lane, Missoula, Montana. Opportunity Bank of Montana provided the construction financing.

7. Bonnie Gabelhausen, a mortgage lender at the Wells branch in Missoula, Montana, worked with and advised the Hobbses regarding a Wells home mortgage rate lock program called the "Builder Best Extended Rate Lock Program" (the "Program") for end-loan refinancing of the construction loan. Under that Program, for a fee, home buyers could lock in a range of interest rates for six and up to 24 months, with the possible option of a one-time "float down" in interest rates.

8. In March 2022, after reviewing the promotional materials regarding the Program and consulting with Ms. Gabelhausen at the bank in Missoula, Montana, the Hobbses applied to Wells for a 30-year mortgage rate lock to refinance the Bruin Lane house upon completion of construction. At the time, the estimated home construction completion date was March 17, 2023. The requested loan amount was $723,000. Wells sent the Hobbses Initial Disclosures dated March 24, 2022, a Loan Estimate dated March 24, 2022, and an Extended Rate Lock Agreement dated March 27, 2022.

9. The terms of the extended rate lock were as follows:

| Rate Lock Period: | 360 days | Interest rate: | 4.125% |
|---|---|---|---|
| Date of rate lock: | March 24, 2022 | Annual percentage rate (APR): | 4.308% |
| Expiration date of rate lock: | March 20, 2023 | Discount Points: | 0.00 |
| **Extended Rate Lock Fee Details** | | | |
| Type of loan: | Conventional | Loan term: | 360 |
| Principal amount of loan at time of rate lock: | $723,000.00 | Upfront extended rate lock fee: | $13,556.25 |
| Extended rate lock fee credit: | $0.00 | | |

10. The Hobbses paid Wells the extended rate lock fee of $13,556.25.

11. On April 11, 2022, Wells sent the Hobbses an email stating, "Your loan is now approved! A few items below will be needed before closing. I understand estimated closing is in 2023 – these items are not needed right away…." The Hobbses provided Wells with the requested items.

12. In reasonable and good faith reliance upon the loan approval documents and email sent by Wells, the Hobbses moved forward with construction with the justifiable expectation that Wells would pay off the construction loan and issue a 30-year mortgage loan at the locked rate upon completion of construction. In addition, they did not seek end-loan refinancing from any other lender.

13. The Hobbses received three 30-day extensions of the rate lock due to construction delays. The last Interest Rate Lock Agreement Wells provided was dated May 12, 2023, at 4.125%, set to expire June 20, 2023. The last Interest Rate Lock Expiration Notice was dated June 2, 2023, stating the rate was about to expire on June 20, 2023.

14. During the latter part of construction, the Hobbses received notice that their local Wells loan officer and loan team had been laid off, and a new loan officer/team took over. The new team began asking for new financial information, which the Hobbses supplied.

15. On or about June 1, 2023, the Hobbses completed construction of their home for a total cost of $800,000. The home appraised for approximately $1,568,000 at that time.

16. Though Wells had notified the Hobbses in 2022 their loan had been approved and though the Hobbses relied upon that representation in moving forward with the project as planned, and even though the Hobbses had applied for the loan (an offer) and Wells had approved it (acceptance), on June 12, 2023, Wells sent notice that it "denied" the Hobbses "loan application" because their debt-to-income (DTI) ratio was "too high."

17. The Hobbses appealed that decision in accordance with Wells' internal procedures. On July 7, 2023, Wells sent a final explanation letter rejecting the appeal and affirming the loan cancellation.

18. The Hobbses demanded a copy of their loan file from Wells, but Wells refused to give it to them.

19. Wells had no good faith basis to cancel the loan and acted arbitrarily and capriciously in its underwriting and risk assessment in 2023. Wells' risk had

not increased between 2022 and 2023 but instead decreased. The Hobbses' DTI did not increase between 2022 and 2023 but instead decreased. On information and belief, Wells canceled because interest rates had increased between 2022 and 2023 and it simply did not wish to honor its commitment and contract to make the loan at the lower, locked-in rate the Hobbses had paid for, in violation of its agreement, promises, and representations and despite the Hobbses' good faith reliance upon them.

20. After the July 7, 2023, rejection letter, Wells refunded the Hobbses the extended rate lock fee of $13,556.25.

21. Wells' last-minute, improper decision to cancel its loan forced the Hobbses to make hasty arrangements to extend their construction loan and to find a replacement mortgage loan in a much less consumer-friendly lending environment than that which existed when they entered their agreement with Wells in 2022. The interest rate on the mortgage they were able to obtain under those exigent circumstances is 7.625%. Based on the original loan principal amount ($723,000) in the Wells agreement, the 7.625% interest rate results in a loan payment about $1,613.00 higher per month than it would have been at the locked-in Wells rate, and a difference of $580,799.24 more in interest over the 30-year mortgage term.

22. The Hobbses' did not discover the falsity of Wells' representations or begin to incur damages until June 12, 2023, when Wells sent the loan cancellation letter.

## CAUSES OF ACTION

### COUNT ONE
### (Breach of Contract)

23. Plaintiffs reallege and incorporate the allegations set forth above.

24. Wells breached its contractual obligations, including the implied covenant of good faith and fair dealing under Montana law, which requires that Wells not do anything unreasonable to deprive the Hobbses of the benefits of the contract. Wells breached the contract, including the implied covenant, by not loaning the funds at the agreed rate and not acting with honesty in fact and/or by observing reasonable commercial standards of fair dealing in the trade.

25. Wells' breach of contract caused substantial, foreseeable injuries to the Hobbses, for which they are entitled to recover damages in an amount to be determined by the jury.

### COUNT TWO
### (Negligent Misrepresentation)

26. Plaintiffs reallege and incorporate the allegations set forth above.

27. Wells represented to the Hobbses that "Your loan is now approved! A few items below will be needed before closing. I understand estimated closing is in 2023 – these items are not needed right away…."

28. Those representations were untrue.

29. Wells made the representations without any reasonable ground for believing them to be true.

30. Wells made the representations with the intent that the Hobbses would rely on them and not seek financing elsewhere.

31. The Hobbses did not know that the representations were false. Hence, they acted upon them by taking actions with significant financial consequences and not seeking financing elsewhere. The Hobbses were justified in relying on the representations because they had previously obtained financing from various other banks and had never had a bank or any of its employees promise them that they had been approved for financing and then had the bank deny the financing.

32. As a result of the Hobbses' reliance on Wells' representations, the Hobbses suffered economic damages and emotional distress.

## COUNT THREE
**(Deceit)**

33. Plaintiffs reallege and incorporate the allegations set forth above.

34. As the above facts demonstrate, Wells deceived the Hobbses over the

course of 2022 and 2023 by repeatedly assuring them their loan had been approved and just a few things were needed prior to closing, which the Hobbses provided. Wells also deceived the Hobbses in June and July 2023 by providing false reasons for its loan cancellation in 2023.

35. Wells' actions constitute deceit, pursuant to Sections 27-1-712 (1) and (2), Mont. Code Ann., and Wells is liable to the Hobbses for their violations of the statute.

## COUNT FOUR
### (Unfair Trade Practice)

36. Plaintiffs reallege and incorporate the allegations set forth above.

37. The Montana Consumer Protection Act prohibits unfair or deceptive acts or practices in any trade or commerce. Section 30-14-103, Mont. Code. Ann.

38. Throughout the course of their interactions with the Hobbses, including through its refusal to provide them with a copy of their loan file, Wells engaged in an extended series of unfair and deceptive acts and patterns of practice, described above.

39. Wells' actions described above involved statements that a transaction involved rights, remedies, and duties it did not involve.

40. The Hobbses suffered economic damages and significant stress, confusion, uncertainty, and fear as a result of Wells' wrongful conduct.

41. The Hobbses are entitled to actual damages, treble damages, punitive damages, and attorneys' fees.

## COUNT FIVE
## (FRAUD)

42. Plaintiffs reallege and incorporate the allegations set forth above.

43. Wells represented to the Hobbses that "Your loan is now approved! A few items below will be needed before closing. I understand estimated closing is in 2023 – these items are not needed right away…."

44. Those representations were material, false representations. Wells knew the representations were false or was ignorant as to whether they were true or not.

45. Wells intended that the Hobbses act upon the representations. Wells wished for the Hobbses to feel confident enough that Wells had approved the 30-year mortgage that would generate thousands of dollars in fees and hundreds of thousands of dollars in interest for Wells that the Hobbses would not pursue a loan with any of Wells' competitors.

46. The Hobbses did not know that the representations were false. Hence, they acted upon them by taking actions with significant financial consequences and not seeking financing elsewhere. The Hobbses were justified in relying on the

representations because they had previously obtained financing from various other banks and had never had a bank or any of its employees promise them that they had been approved for financing and then had the bank deny the financing.

47.  As a result of the Hobbses' reliance on Wells' representations, the Hobbses suffered economic damages and emotional distress.

## PUNITIVE DAMAGES

48.  Plaintiffs reallege and incorporate the allegations set forth above.

49.  Wells knew or intentionally disregarded facts creating a high probability of injury to the Hobbses and: (a) deliberately proceeded to act in conscious or intentional disregard of the high probability of injury to them; or (b) deliberately proceeded to act with indifference to the high probability of injury to them.  As a result, Wells is liable for punitive damages under Montana law.

WHEREFORE, Plaintiffs pray for judgment in their favor and:

1.  For an award of all actual and statutory damages, including emotional distress, along with pre- and post-judgment interest;

2.  For an award of treble damages pursuant to § 30-14-133, Mont. Code Ann.;

3.  For an award of punitive damages;

4.  For an award of attorneys' fees as permitted by Montana law;

5.  For an award of costs; and,

6. For such other and further relief as may be just and equitable.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38, Plaintiffs hereby demand a trial by jury.

DATED this 24th day of May 2024.

                                                          RESOLUTE LAW FIRM PLLC

                                                         /s/ Timothy Strauch
                                                         Timothy Strauch