IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

|  |  |
|---|---|
| TYLER HOBBS and ALYSSA HOBBS,<br><br>               Plaintiffs,<br><br>vs.<br><br>WELLS FARGO BANK, N.A.,<br><br>               Defendant. | CV 24–73–M–DWM<br><br><br>OPINION<br>and ORDER |

On May 24, 2024, Tyler Hobbs and Alyssa Hobbs sued Wells Fargo Bank ("Wells Fargo"), alleging state and federal claims arising from a rate-lock mortgage agreement. (*See* Doc. 1.) The Hobbses filed an amended complaint on August 30, alleging breach of contract, negligent misrepresentation, deceit in violation of Montana Code Annotated § 27-1-712(2), unfair trade practices in violation of the Montana Consumer Protection Act, and fraud. (*See* Doc. 12.) Wells Fargo seeks to dismiss the Hobbses' claims in their entirety under Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure. (Doc. 15.) That motion is denied as to the breach of contract and unfair trade practices claims but granted in all other respects.

## BACKGROUND

At this stage, the factual allegations in the complaint "are taken as true and construed in the light most favorable to the plaintiffs." *Lee v. City of L.A.*, 250 F.3d 668, 679 (9th Cir. 2001) (internal quotation marks and citations omitted).

In 2022 and 2023, the Hobbses built a home in Missoula, Montana. (Doc. 12, at ¶ 7.) "[H]edg[ing] against rising interest rates," the Hobbses "took advantage of a rate lock program offered through the local Wells [Fargo] branch called the 'Builder Best Extended Rate Lock Program' (the 'Program') for end loan refinancing of a construction loan." (*Id.*) The Program permitted interest rate locks for up to twenty-four months. (*Id.*)

In February 2022, the Hobbses had initial discussions about the Program with Bonnie Gabelhausen, a mortgage lender at the Missoula Wells Fargo branch. (*Id.*) Before applying to the Program, the Hobbses asked about debt-to-income ratio calculations for their then-current residence (located at Brumby Lane, Missoula). (*Id.* ¶ 8.) Specifically, the Hobbses inquired "whether they could keep Brumby as a rental once they moved into the new home" and "whether Wells [Fargo] would be willing to offset the debt on Brumby by the rental income." (*Id.*) Gabelhausen explained that Wells Fargo would require proof of a 12-month signed lease and deposit, take seventy-five percent of monthly rental income, and use that

to offset debt or add qualified income. (*Id.*)  The Hobbses also considered selling and paying off Brumby. (*Id.*)

In March 2022, after considering information on the Program and the conversation with Gabelhausen, the Hobbses submitted their application to Wells Fargo for a "[thirty]-year mortgage rate lock to refinance their home upon completion of construction." (*Id.* ¶ 9.)  The Hobbses requested a $723,000 loan and estimated construction would finish on March 17, 2023. (*Id.*)  Wells Fargo accepted the loan application and provided the Hobbses with three documents: (1) Initial Disclosure, dated March 24, 2022, (2) Loan Estimate, dated March 24, 2022, and (3) Extended Rate Lock Agreement, dated March 27, 2022 and signed by Susan M. Barber, Head of Distributed Retail Sales for Wells Fargo. (*Id.* ¶ 10.) The Hobbses accepted the Extended Rate Lock Agreement by paying the lock-rate-fee of $13,556.25. (*Id.* ¶ 11.)

On April 11, 2022, Wells Fargo sent the Loan Approval Email and the Loan Commitment Letter to the Hobbses. (*Id.* ¶ 12.)  The Loan Approval Email stated "Your loan is now approved!  A few items below will be needed before closing.  I understand estimated closing is in 2023 – these items are not needed right away." (*Id.* ¶ 13.)  The Loan Commitment Letter stated, "[i]f there are any material changes in your financial status, the information you provided in your application, or the condition of the property, that would cause your loan to no longer meet

3

applicable regulatory requirements, the terms of this loan commitment may be reconsidered or withdrawn." (*Id.* ¶ 14.) The Loan Commitment Letter further explained that "[i]f you have a Lock Rate Agreement, we may modify the terms of this commitment if you do not close your loan by the Rate Lock-in expiration date that appears in your Interest Rate Lock Agreement letter." (*Id.* ¶ 15.) The Hobbses moved forward with construction and upon completion expected "Wells [Fargo] would pay off the construction loan and issue a [thirty]-year mortgage loan at the locked rate." (*Id.* ¶ 16.) Consequently, the Hobbses did not pursue end-loan refinancing elsewhere. (*Id.*) The Hobbses experienced construction delays that were communicated to Wells Fargo. (*Id.* ¶ 17.) Wells Fargo provided notice to the Hobbses that Gabelhausen had been laid off and they would be working with a new team. (*Id.*) The Hobbses continued to supply additional information as requested. (*Id.*)

On May 12, 2023, Wells Fargo sent an updated Interest Rate Lock Agreement to the Hobbses signed by Barber. (*Id.* ¶ 18.) The updates included an increased loan amount of $761,000, ARP of 4.285%, and a new lock rate expiration date, June 20, 2023. (*Id.*) The Interest Rate Lock Agreement explained that the rate lock "won't change between the offer, closing and disbursement of funds" so long as closing occurs before expiration and the application has not changed. (*Id.* ¶ 19.) The Interest Rate Lock Agreement required extensions in the

event a "rate lock w[ould] expire prior to closing." (*Id.*)  An extension would be given at no additional cost so long as the Hobbses promptly responded to requests for information ensuring the application would "move[] forward." (*Id.*)  Further, the Interest Rate Lock Agreement explained that rates were subject to modifications in certain circumstances including changes in the type of loan, downpayment amount, loan-to-value ratio, initial appraised value, credit profile, or qualifying income. (*Id.* ¶ 20.)  Finally, the Interest Rate Lock Agreement was subject to change if income information could not be verified. (*Id.*)

On June 1, 2023, the Hobbses' home was completed, and it appraised for approximately $1,568,000. (*Id.* ¶ 21.)  The total construction cost was $800,000. (*Id.*)  During the relationship between the Hobbses and Wells Fargo, the Hobbses supplied all requested information, including the Brumby 12-month lease and proof of deposit, continued to request Wells Fargo move forward, and provided all materials required for closing. (*Id.* ¶ 22.)  On June 2, 2023, "Wells [Fargo] sent the Hobbses an Interest Rate Lock Expiration Notice," confirming the expiration date, June 20, 2023, and stated "if your rate lock will expire prior to closing and disbursement of funds, we will automatically extend your rate lock at no cost to you." (*Id.* ¶ 23.)

The Hobbses were notified that the loan application was denied while "in the midst of attempting to close on the loan." (*Id.* ¶ 24.)  The Hobbses first learned

this information on June 7, 2023, by a phone call from Guillermo Calderas, a Wells Fargo employee. (*Id.*)  On June 12, 2203, Wells Fargo confirmed the application was denied in a letter.  (*Id.*)  The only reason articulated by Wells Fargo for the denial was "that the Hobbses' debt to income ratio was too high." (*Id.* ¶ 25.) Calderas explained that Wells Fargo was "not offsetting the debt" with the Brumby rental income as Gabelhausen initially represented.  (*Id.* ¶ 26.)  The Hobbses notified Calderas of the 12-month lease and proof of deposit which he subsequently requested and said, "he would forward them to the underwriters." (*Id.*)  After providing the documents, the Hobbses "never heard back from Wells [Fargo]." (*Id.*)

Despite Wells Fargo's stated reason, the Hobbses' debt-to-income ratio had improved since Wells Fargo's initial approval. (*Id.* ¶ 27.)  The Hobbses proved this information to Wells Fargo. (*Id.*)  The Hobbses believe the real reason Wells Fargo denied the application was because interest rates increased between 2022 and 2023, and Wells Fargo "did not wish to honor its commitment" to the lower locked-in rate. (*Id.*)  After denying the application, Wells Fargo "denied internal appeal of its reversal, unilaterally refunded the extended rate lock fee, and refused to give the Hobbses a copy of their loan file." (*Id.* ¶ 29.)

The Hobbses extended their construction loan and found another mortgage loan in a "less consumer-friendly lending environment." (*Id.* ¶ 30.)  The Hobbses

obtained a mortgage with a 7.625% interest rate, which meant paying $1,613 more per month. (*Id.*) Over the thirty-year mortgage period, the Hobbses will pay $580,799.24 more in interest than they would have under the original Interest Rate Lock Agreement. (*Id.* ¶ 30.)

**LEGAL STANDARDS**

## I. Rule 12(b)(6)

A motion to dismiss is proper when the complaint "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). The operative inquiry is whether the complaint contains "sufficient factual matter, accepted as true, to state a claim of relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "All factual allegations set forth in the complaint are taken as true and construed in the light most favorable to plaintiffs." *Lee*, 250 F.3d at 679 (internal quotation marks and citations omitted). "Conclusory allegations of law, however, are insufficient to defeat a motion to dismiss." *Id.* Generally, review is limited to the facts alleged in the pleadings or the motion should be converted into a motion for summary judgment under Rule 56. *Id.* at 688. "A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint,

or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Here, the Amended Complaint incorporates by reference the following documents: Extended Rate Lock Agreement, (Doc. 9-1); Loan Approval Email, (Doc. 9-2); Loan Commitment Letter, (Doc. 9-3); Interest Rate Lock Agreement, (Doc. 9-4); and Interest Rate Lock Expiration Notice, (Doc. 9-5). (*See* Doc. 12 at ¶¶ 10, 12–13, 18, 23.)

## II.    Rule 9(b)

"In alleging fraud . . . a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Any alleged conduct that "is said to be grounded in fraud or to sound in fraud . . . must satisfy the particularity requirement of Rule 9(b)." *In re Cloudera, Inc.*, 121 F.4th 1180, 1186 (9th Cir. 2024) (internal quotation marks omitted). "To comply with Rule 9(b), allegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged so that they can defend against the charge and not just deny that they have done anything wrong." *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 765 (9th Cir. 2023) (internal quotation marks omitted). Consistently, "[t]he complaint must specify such facts as the times, dates, places, benefits received, and other details of the alleged fraudulent activity." *Id.* (internal quotation marks omitted); *United States*

*v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1180 (9th Cir. 2016) (noting particularity means "the plaintiff must allege the who, what, where, and how of the misconduct charged" (internal quotation marks omitted)). "Most importantly, the complaint must explain what is false or misleading about the purportedly fraudulent statement, and why it is false." *In re Cloudera, Inc.*, 121 F.4th at 1187 (internal quotation marks omitted). Hindsight cannot be relied upon, instead, the complaint "must explain why statements were false or misleading at the time they were made." *Id.* (internal quotation marks omitted).

The Hobbses' negligent misrepresentation (Count 2), deceit (Count 3), and fraud (Count 5) claims are subject to the heightened pleading standard under Rule 9(b) because all are grounded in fraud. *See Pfau v. Mortenson*, 858 F. Supp. 2d 1150, 1158 (D. Mont. Apr. 30, 2012) (applying Rule 9(b) pleading standard to fraud and deceit); *Deveraux v. Meadowlark of Billings LLC*, 2023 WL 2330311, at *4 (D. Mont. Mar. 2, 2023) (explaining negligent misrepresentations are considered to be "grounded in fraud" and are subject to Rule 9(b) pleading standard). To the extent that the Montana Consumer Protection Act claim (Count 4) is "predicated on alleged fraudulent conduct," it is also subject to the heightened pleading standard under Rule 9(b). *Guthridge v. Johnson & Johnson Corp. & Ethicon, Inc.*, 2023 WL 6626175, at *5 (D. Mont. Sept. 22, 2023).

**ANALYSIS**

9

Wells Fargo's motion to dismiss is denied as to the Hobbses' breach of contract and unfair trade practices claims but granted as to remaining claims for negligent misrepresentation, deceit, and fraud. As the forum state, Montana law applies in this diversity action. *Med. Lab. Mgmt. Consult. v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir. 2002).

## I.      Count 1 – Breach of Contract

"The essential elements of a breach of contract claim are: (1) a valid and enforceable contract; (2) breach of an express or implied contract duty or obligation; and (3) resulting contract damages." *Kostelecky v. Peas in a Pod LLC*, 518 P.3d 840, 859 (Mont. 2022) (footnote omitted).  The claimant must also prove that the breach of contract was the proximate cause of the damages. *Id.* at 860. "Alleged errors or omissions by a lender in the servicing or administration of a mortgage loan is thus generally compensable only in contract on a claim for breach of express contract terms or the implied covenant of good faith and fair dealing." *House v. U.S. Bank Nat'l Ass'n*, 481 P.3d 820, 828 (Mont. 2021).

### A. Breach of Express Terms[1]

---

[1] Any extrinsic evidence, such as statements made by Gabelhausen, were not considered in relation to this claim because (1) the Amended Complaint does not allege that the contracts are ambiguous; (2) the Amended Complaint alleges that express terms of the contracts were breached, (Doc. 12 at ¶ 34); (3) mortgage loans are required to be in writing under Montana law, *see* Mont. Code Ann. § 71-1-203 ("A mortgage of real property can be created, renewed, or extended only by writing . . . ."); and (4) written contracts cannot be modified by precursory oral

It is not disputed that the Extended Rate Lock Agreement, Loan Commitment Letter, and Interest Rate Lock Agreement constitute valid and enforceable contracts. (*See* Doc. 12 at ¶ 33.)  The Hobbses allege that Wells Fargo breached the express condition within the Loan Commitment Letter that it "could not be modified prior to June 20, 2023 (the last Rate Lock-in expiration date)." (*Id.* ¶ 34.)  Assuming that the Hobbses meant to allege that this express condition was actually within the Interest Rate Lock Agreement rather than the Loan Commitment Letter, the following analysis applies.  (*Compare* Doc. 9-3 (stating a lock-in expiration date of March 20, 2023), *with* Doc. 9-4 (providing an expiration date of June 20, 2023).)  To the Hobbses' knowledge, they performed on the contract, supplying "all information, records, and documentation Wells [Fargo] requested," and the loan was moving forward.  (Doc. 12 at ¶ 22.)  The alleged breach occurred on June 7, 2023 when Wells Fargo notified the Hobbses that their loan application was denied because their debt-to-income ratio was too high, (*id.* ¶¶ 24–25), despite the fact that the Hobbses provided documentation proving their "debt-to-income ratio had actually decreased in the year since Wells[] [Fargo's]

---

representations made on the same subject, *Blome v. First Nat'l Bank of Miles City*, 776 P.2d 525, 528 (Mont. 1989) ("Evidence of prior oral agreements is not admissible for the purpose of altering subsequent written agreements dealing with the same subjects . . . ." (internal modifications and quotation marks omitted)). Notably, even if the Hobbses alleged that there was an oral contract, it would be unenforceable under the statute of frauds. *Id.* (contracts must be in writing when the performance term lasts more than one year).

approval," (*id.* ¶ 27).  While the Extended Rate Lock Agreement provided that "interest rate and terms . . . may change in some situations," (Doc. 9-4 at 3), the Hobbses allege that the reasoning provided by Wells Fargo is "bogus" and did not comport with the contracts' express terms, (Doc. 12 at ¶ 34).  Construing the Hobbses allegations as true, it is plausible that Wells Fargo breached the express term that it would not modify in absence of material changes as provided by the contract before the expiration date.  And, as a result of the denied application, the Hobbses incurred actual damages.  (*See id.* ¶ 30.)  The Hobbses had to find a last-minute replacement loan at a much higher interest.  (*Id.*)  Accordingly, the Hobbses allege a plausible breach of contract claim.

### B. Breach of Implied Covenant of Good Faith and Fair Dealing

Under Montana law, "every contract, regardless of type, contains an implied covenant of good faith and fair dealing." *Phelps v. Frampton*, 170 P.3d 474, 482 (Mont. 2007) (internal quotation marks omitted).  This implied covenant requires "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade."  Mont. Code Ann. § 28-1-211.  "[T]he implied covenant is a mutual promise that the contracting parties will not attempt, through dishonesty or abuse of discretion in performance, to deprive each other of the benefits of the contract." *Phelps*, 170 P.3d at 485 (emphasis omitted).  "[T]o recover on a theory of breach of the implied covenant, there must be an enforceable contract to which

the covenant attends." *Id.* at 483 (internal alterations and quotation marks

omitted). However, "a breach of the underlying contract is not a prerequisite to a

breach of the implied covenant of good faith and fair dealing." *Farris v.*

*Hutchinson*, 838 P.2d 374, 375 (Mont. 1992). "[W]hen one party uses discretion

conferred by the contract to act dishonestly or to act outside of accepted

commercial practices to deprive the other party of the benefit of the contract, the

contract is breached." *Tvedt v. Framers Ins. Grp. of Cos.*, 91 P.3d 1, 6 (Mont.

2004) (emphasis and internal quotation marks omitted). "[T]he nature and extent

of the obligation of good faith and fair dealing is measured by *justifiable*

*expectations* of the parties." *Talley v. Flathead Valley Cmty. Coll.*, 857 P.2d 701,

707 (Mont. 1993).

Here, the Hobbses plausibly allege that Wells Fargo breached the implied

covenant of good faith and fair dealing. The Hobbses claim that Wells Fargo

"deprive[d] the[m] . . . of the benefits of the contract through dishonest or abuse of

discretion in performance of the conditions relating to modifying or terminating the

loan and/or the rate lock." (Doc. 12 at ¶ 36.) Taking the facts of the complaint as

true, Wells Fargo abused its discretion and acted dishonestly when it accepted the

loan application and then denied it only during closing because the Hobbses debt-

to-income ratio was too high. (*Id.* ¶ 25.) Further, despite being presented with

evidence that the Hobbses debt-to-income ratio had actually improved, Wells

Fargo did not reconsider or provide any other reason for denying the loan. (*Id.* ¶¶ 27, 29.)  Although the Loan Commitment Letter and Interest Rate Lock Agreement provided that the loan may be reconsidered, Wells Fargo did not provide a legitimate reason under the express terms and conditions of these documents for rejecting the application.  The timing of the loan denial, after being approved for over a year, also weighs in the Hobbses' favor.

As pled by the Hobbses, Wells Fargo deprived the Hobbses of the benefit of the contracts by denying their loan application without notice or adequate reasoning.  *See Puryer v. HSBC Bank USA, Nat'l Ass'n*, 419 P.3d 105, 112 (Mont. 2018) (holding that the plaintiff successfully pled breach of the implied covenant of good faith and fair dealing when the lender "attempted to deprive [the plaintiff] from receiving the benefit of the contract by attempting to foreclose on the mortgage and not providing the required notice setting forth [the plaintiffs] ability to cure the default" (internal quotation marks and modifications omitted)).  Accordingly, the Hobbses' implied covenant claim also survives at this stage.

## II.  Non-Contract Claims

"In the consumer mortgage loan context, the nature of the relation between lender and borrower is generally a non-fiduciary, arms-length contractual relationship limited to express contract duties and the implied contract duty of good faith and fair dealing." *House*, 481 P.3d at 828 (internal modifications and

quotations omitted).  Here, the Hobbses do not allege that the relationship is more than an arms-length contractual relationship.  Thus, Wells Fargo is not subject to any heightened duty and is only required to use reasonable care.  *See Anderson v. ReconTrust Co., N.A.,* 407 P.3d 692, 697 (Mont. 2017) ("All individuals have a general common law duty to use reasonable care under the circumstances to avoid causing foreseeable harm to others.").

### A. Count 4 – Unfair Trade Practices

To the extent that this claim is based on Wells Fargo's failure to provide the Hobbses with a copy of their loan file, (Doc. 12 at ¶ 53), it is preempted by the Fair Credit Reporting Act.  *See Morrow v. Bank of Am., N.A.*, 324 P.3d 1167, 1181 (Mont. 2014) ("[S]tate statutory causes of action premised on damages directly related to a bank's credit reporting duties are preempted by the Fair Credit Reporting Act.").  However, the Hobbses' claim is a bit more nuanced insofar as they claim that, without the loan file, they did not know the real reason the loan was denied.  (Doc. 12 at ¶¶ 25, 27.)

The Montana Consumer Protection Acts provides "[u]nfair methods of competition and unfair or deceptive acts or practice in the conduct of any trade or commerce are unlawful."  Mont. Code Ann. § 30-14-103.  A private plaintiff must prove three elements to assert a Montana Consumer Protection Act claim: (1) "that the defendant used or employed an unfair or deceptive act or practice in the

conduct of any trade or commerce," (2) "in regard to which the claimant was a consumer as defined by § 30-14-102(1), MCA," and (3) "which caused the claimant to suffer direct or indirect financial detriment or detrimental financial impact." *Kostelecky*, 518 P.3d at 861 (internal modifications, quotation marks, and citations omitted).  All three elements have been pled here.

As to the first element, although the Montana Consumer Protection Act "does not specifically define what constitutes an unfair or deceptive trade act or practice," the Montana Supreme Court has construed such a practice to be one "contrary to established public policy *and* which is either immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Anderson*, 407 P.3d at 700 (internal quotation marks omitted).  "[F]or a representation to be actionable . . . it must have been *untrue when made*." *WLW Realty Partners, LLC v. Cont'l Partners VIII, LLC*, 360 P.3d 1112, 1118 (Mont. 2015).  Here, the Hobbses claim that (1) Wells Fargo wrongfully terminated the loan agreement because the Hobbses' financial condition was not materially different, (Doc. 12 at ¶¶ 14–15, 20, 27); (2) despite being approved, Wells Fargo denied the application during closing, stating it was because of the increased debt-to-income ratio when the ratio had improved, (*id.* ¶¶ 25, 27); (3) Wells Fargo did not calculate the debt-to-income ratio as "promised," (*id.* ¶ 52); and (4) Wells Fargo refused to provide the Hobbses with a copy of their loan file, (*id.* ¶ 53).  In so doing, the Hobbses

have plausibly alleged that Wells Fargo's conduct offended established public policy and was substantially injurious to consumers.

As to the second element, a consumer is "a person who purchases or leases goods, services, real property, or information primarily for personal, family, or household purposes." Mont. Code Ann. § 30-14-102(1).  It is undisputed that the Hobbses are consumers.  And, as to the third element, because of the delayed notification, the Hobbses were forced to acquire a different loan at a 7.625% interest rate, (Doc. 12 at ¶ 30), compared to the original locked-in rate it had with Wells Fargo of 4.285%, (*id.* ¶ 18).  This is sufficient to satisfy element three. *Jacobson v. Bayview Loan Servicing, LLC*, 371 P.3d 397, 412 (Mont. 2016) (explaining that incurring costs and fees, lost opportunities to save a home, negative impacts on credit, not receiving a modification agreement, and inability to receive incentive payments sufficiently demonstrate pecuniary loss).

Accordingly, Wells Fargo's motion to dismiss the Hobbses' unfair trade practices claim (Count 4) is denied.

### B. Count 3 – Deceit

"One who willfully deceives another with intent to induce that person to alter the person's position to the person's injury or risk is liable for any damage that the person suffers." Mont. Code Ann. § 27-1-712(1).  Deceit means

> (a) the suggestion as a fact of that which is not true by one who does not believe it to be true;

17

(b) the assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

(c) the suppression of a fact by one who is bound to disclose it or who gives information of other facts that are likely to mislead for want of communication of that fact; or

(d) a promise made without any intention of performing it.

*Id.* § 27-1-712(2).

Here, the Hobbses allege that Wells Fargo reneged on an agreement to provide a loan at a locked-in rate. Importantly, the Hobbses believed that "Wells [Fargo] canceled because interest rates had increased between 2022 and 2023 and it simply did not wish to honor its commitment and contract to make the loan at the lower, locked-in rate the Hobbses had paid for," (*id.* ¶ 27), and not because their debt-to-income ratio was too high, (*id.* ¶ 25). However, the Amended Complaint does not identify the specific deceptive acts; instead, it lists, almost verbatim, the legal definitions of deceit under Mont. Code Ann § 27-1-712(2). (*See id.* ¶ 48(a)– (d).) These allegations are insufficient to show deceit because the Hobbses admit that at some point in time there was a legitimate offer to lend, (*see id.* ¶ 27 ), and the allegations do not otherwise provide specific facts to satisfy the higher pleading standard of Rule 9(b). Accordingly, Wells Fargo's motion to dismiss the Hobbses' deceit claim (Count 3) is granted.

### C. Written and Oral Representations

The pleadings as to negligent misrepresentation (Count 2) and fraud (Count 5) are identical.  (*See* Doc. 12 at ¶¶ 40(a)–(f), 41, 57(a)–(f), 58.)  The representations at issue include written representations within the Loan Approval Email and the Loan Commitment Letter, (*id.* ¶¶ 40(a)–(f), 57(a)–(f)), and oral representations "including but not limited to" the calculation of the Hobbses' debt-to-income ratio with respect to their rental property, (*id.* ¶¶ 41, 58).  While the Amended Complaint has several shortcomings, the primary issue is that it fails to establish that Wells Fargo had the requisite knowledge that the statements were baseless, knew of the falsity of the representations, or were ignorant of their truth *at the time the representations were made*.  Instead, the Hobbses allege that Wells Fargo's intent changed when interest rates increased.  (*Id.* at ¶ 27.)  Neither a negligent misrepresentation nor a fraud claim can proceed on those facts.  Moreover, neither claim is pled with particularity as required by Rule 9(b).

### 1. Count 2 – Negligent Misrepresentation

To prevail on a claim for negligent misrepresentation, a plaintiff must show the following elements:

> 1) the defendant made a representation as to a past or existing material fact;
> 2) the representation must have been untrue;
> 3) regardless of its actual belief, the defendant must have made the representation without any reasonable ground for believing it to be true;
> 4) the representation must have been made with the intent to induce the plaintiff to rely on it;

5) the plaintiff must have been unaware of the falsity of the representation; it must have acted in reliance upon the truth of the representation, and it must have been justified in relying on the representation; [and]
6) the plaintiff, as a result of his or her reliance, sustained damage.

*Kurtzenacker v. Davis Surveying, Inc.*, 278 P.3d 1002, 1007–08 (Mont. 2012) (internal quotation marks omitted). Under the second element, the "statement may turn out to be untrue without being untruthful when it was made." *WLW Realty Partners, LLC*, 360 P.3d at 1117 (internal quotation marks omitted). A statement regarding a future fact does not constitute a representation for purposes of satisfying the elements. *Davis v. Church of Jesus Christ Latter Day Saints*, 852 P.2d 640, 644 (Mont. 1993).

As it relates to oral representations, the Hobbses allege that Gabelhausen negligently misrepresented how the Hobbses debt-to-income ratio would be calculated. (Doc. 12 at ¶¶ 7–8.) This allegation fails as a matter of law because that representation was as to a future fact rather than a past or existing fact. *See Davis*, 852 P.2d at 644.

Analyzing the elements in turn below as to the written statements, the Hobbses ultimately fail to allege sufficient facts to satisfy element three, i.e., that regardless of Wells Fargo's actual belief, it made certain representations without any reasonable ground for believing them to be true.

As to the first element, Wells Fargo made a representation as to an existing material fact when it made written representations that it would make a loan at the

locked-in rate to the Hobbses conditional on compliance with terms and conditions of the Loan Commitment Letter. (Doc. 12 at ¶¶ 12–15, 18–20.) As to the second element, the written representations ended up being untrue because Wells Fargo did not provide a legitimate reason under the contract to reject the loan application. (*Id.* ¶ 24.) As to the fourth element, representations made in the Loan Approval Email and the Loan Commitment Letter were made to induce the Hobbses to rely on them and not seek financing elsewhere when Wells Fargo told the Hobbses "Your loan is now approved!" (*id.* at ¶ 13), and that Wells Fargo would "honor this commitment to the best of [its] ability," (Doc. 9-3 at 3). As to the fifth element, the Hobbses were unaware of the alleged falsity of the representations, relied on the representations, and the reliance was reasonable. Here, the Hobbses allege that they were first notified of their denied application on June 7, 2023, while in the process of attempting to close the loan. (Doc. 12 at ¶ 24.) The Hobbses acted in reliance upon the truthfulness of the Loan Approval Email and the Loan Commitment Letter when they did not seek other financing in 2022. (*Id.* ¶¶ 30, 44.) This reliance was justified because it was reasonable for the Hobbses to believe that if they complied with the terms of the Extended Lock Rate Agreement, Loan Commitment Letter, and Interest Rate Lock Agreement, then Wells Fargo would extend the loan at the locked-in rate. As to the sixth element, the Hobbses relied on the representation to their detriment because they did not engage another

lender in a consumer-friendly environment and had to obtain a different mortgage in a less friendly market requiring them to pay "$580,799.24 more in interest over the [thirty]-year mortgage term." (*Id.* ¶ 30.)

However, the Hobbes' pleading fails at the third element because the Hobbses fail to allege that the original representations were baseless. Instead, the Hobbses allege that they believe that Wells Fargo denied their application because interest rates had increased and Wells Fargo "simply did not want to honor its commitment and contract to make the loan at the lower" rate. (*Id.* ¶ 27.) In so pleading, the Hobbses do not allege that Wells Fargo had no reasonable belief it would lend to the Hobbses when it originally made the written representations; rather, just that its motivations changed. Additionally, some alleged facts actually indicate the opposite. For example, Wells Fargo sent the Interest Rate Lock Agreement including updated interest rate lock details to the Hobbses on May 12, 2023, (*id.* ¶ 18), and, on another occasion, Wells Fargo communicated that a new team would be managing the Hobbses loan and continued to request additional information, (*id.* ¶ 17). These facts indicate that Wells Fargo continued to move the loan forward. (*See id.* ¶ 12.)

Based on the foregoing, neither the oral nor written representations satisfy the elements of negligent misrepresentation. Wells Fargo's motion to dismiss is granted as to Count 2.

## 2.  Count 5 – Fraud

To prevail on a claim for actual fraud, a plaintiff must show the following:

(1)  a representation;
(2)  falsity of the representation;
(3)  materiality of the representation;
(4)  speaker's knowledge of the falsity of the representation or ignorance of its truth;
(5)  speaker's intent that it be relied upon;
(6)  the hearer's ignorance of the falsity of the representation;
(7)  the hearer's reliance on the representation;
(8)  the hearer's right to rely on the representation; and
(9)  the hearer's consequent and proximate injury caused by the reliance on the representation.

*McCulley v. U.S. Bank*, 347 P.3d 247, 256 (Mont. 2015).  "Actual fraud is always a question of fact."  *In re Estate of Kindsfather*, 108 P.3d 487, 490 (Mont. 2005) (citing Mont. Code Ann. § 28-2-404).

Like negligent misrepresentation, the oral representations made by Gabelhausen do not constitute fraud because they were as to a future event.  *See Deveraux*, 2023 WL 2330311, at *4 (explaining "[t]he representation . . . must ordinarily be an affirmation of past or existing facts to be an actionable fraud claim; predictions as to future events are deemed opinions, not actionable by fraud" (internal quotation marks and citations omitted)).  The Hobbses' fraud claim premised on Wells Fargo's written statements likewise fails.  Fraud requires that the representations at issue be made with "knowledge of falsity" or "ignorance of . . . truth."  *McCulley*, 347 P.3d at 256.  Here, while the circumstances surrounding

23

the loan application denial are suspicious, the Hobbses do not allege any facts that indicate that Wells Fargo made the written representations in the Loan Approval Email and the Loan Commitment Letter either knowing that they were false or in ignorance of the truth.

Therefore, neither the oral nor written representations satisfy the elements of fraud. Wells Fargo's motion to dismiss is granted as to Count 5.

## CONCLUSION

Based on the foregoing, IT IS ORDERED that Wells Fargo's motion to dismiss is DENIED IN PART and GRANTED IN PART. The motion is DENIED as to Count 1 (breach of contract) and Count 4 (unfair trade practices). The motion is GRANTED as to Count 2 (negligent misrepresentation), Count 3 (deceit), and Count 5 (fraud). A preliminary pretrial conference will be set by separate order.

DATED this 23rd day of December, 2024.

Donald W. Molloy, District Judge
United States District Court

24